Melanie A. O'HARA, et al., Plaintiffs,

v.

MT. VERNON BOARD OF EDUCATION, et al., Defendants.

No. C2–95–554.

United States District Court, S.D. Ohio, Eastern Division.

Aug. 26, 1998.

D. Wesley Newhouse, II, Lane Alton & Horst, Columbus, OH, for Plaintiffs.

John Curtis Albert, Crabbe Brown Jones Potts & Schmidt, Columbus, OH, George E. Roberts, III, Ennis Roberts & Fischer, Cincinnati, OH, for Defendants.

## MEMORANDUM AND ORDER

HOLSCHUH, District Judge.

This matter is before this Court on a motion for summary judgment filed by the defendants (Record at 29), plaintiff's memorandum in response (Record at 61), and the defendants' reply memorandum. (Record at 67.) The motion has been fully briefed and is ready for decision.

## I. FACTUAL BACKGROUND

The plaintiff[1] is a school teacher with the responsibility of educating and guiding students with various developmental disabilities. The plaintiff is employed by the defendant, the Mt. Vernon Board of Education, as a teacher at the Dan Emmett Elementary School, Mount Vernon, Ohio. Named defendants also include K. Lee Rhoades, Principal of the Dan Emmett Elementary School, and Jeffrey R. Sittason, the Superintendent of Schools; both are employees of the Mt. Vernon Board of Education.

This lawsuit stems from a series of communications and events pertaining to the plaintiff's request for pregnancy and parental leave. On January 28, 1994, the plaintiff sent a letter to Dr. Robert Truman, Director of Instructions, requesting sick leave and also parental leave under the Family and Medical Leave Act (FMLA). The plaintiff stated that she would be on sick leave through February 2, 1994 and requested that her FMLA leave begin on February 2, 1994 and last until released from her doctor's care or no later than May 12, 1994. (Plaintiff's Exhibit 37.) The plaintiff also inquired about insurance coverage during her parental leave. (Id.) On February 17, 1994, Director Truman responded to the plaintiff, stating that she had previously used 5.1 weeks of sick leave which would be deducted from the 12 weeks granted by the FMLA and would result in the FMLA leave expiring on March 18, 1994. The letter further advised plaintiff that thereafter she would be responsible for the total insurance premiums under the school district's insurance program. (Plaintiff's Exhibit 4.) On February 27, 1994, the plaintiff's child was born. On March 1, 1994, Director Truman wrote to congratulate the plaintiff, to inform her that she obviously could request parental leave, and to inform her that if the first day of leave is after January 1 in any school year, the leave shall be for the remainder of the school year or at a time otherwise mutually agreed to pursuant to the parental leave provision of the Master Contract, a collective bargaining agreement[2]

1. The plaintiffs, husband and wife, have alleged a claim for loss of consortium. This claim is not addressed by defendants in the motion for summary judgement. This Memorandum and Order will refer to Mrs. Melanie A. O'Hara as the plaintiff for purposes of brevity and clarity.

2. The CBA was entered into by the Mt. Vernon Board of Education and the Mt. Vernon Edu-

(CBA). (Plaintiff's Exhibit 42.) On March 16, 1994, Director Truman wrote to the plaintiff indicating that parental leave must begin on the date of her child's birth. In the March 16 letter, Director Truman also indicated that this would require the plaintiff to take leave until the end of the school year. Furthermore, according to the letter, plaintiff was required to begin making monthly payments of $546.12 for medical insurance as of March 31, 1994. (Defendants' Exhibit K.) Simultaneously, on March 16, 1994, the plaintiff wrote to Superintendent Sittason informing him that she would be able to return to work on April 26, 1994. (Plaintiff's Exhibit 44 and Defendants' Exhibit M.) In response, on March 18, 1994, Superintendent Sittason denied the plaintiff's request to return on April 26, 1994, citing the CBA requirement that parental leave "granted after January 1 of a given year shall be for the remainder of that school year, unless it is otherwise mutually agreed to." Superintendent Sittason expressed his feeling that it would be in the best interest of the children that plaintiff's parental leave continue for the remainder of the school year and that therefore "we do not mutually agree to your returning April 26." (Plaintiff's Exhibit 36).

On March 24, 1994, the plaintiff wrote to Superintendent Sittason to express her disagreement with the position that she could not return to work during the remainder of the school year and her belief that it was the school district's obligation to pay for her insurance in April "since I will be working in the month of April." (Plaintiff's Exhibit 45.) The plaintiff's letter generated this response from Director Truman on March 25, 1994:

Your parental leave will be granted from February 2, 1994, the date you requested in your letter of January 28, 1994. It will be for the balance of the 1993–94 school year. In accordance with the *Master Contract*, you have the option of returning for the 1994–1995 school year.

You will need to contact Nancy Sinclair regarding payment of whatever insurances you wish to carry before March 31, 1994.

cation Association. There is no dispute that the plaintiff was a member of the Education Associa-

You absolutely need to pay your insurance premium responsibility, otherwise you do not have coverage for April 1994.

(Defendants' Exhibit N.)

Section 705(1) of the CBA provides:

Upon written notice to the superintendent a teacher shall be granted a parental leave of absence without pay. If the first day of the leave is prior to January 1, the leave granted shall be for the remainder of the school year or at a time otherwise mutually agreed to. If the first day of the leave is after January 1 in any school year, the leave shall be for the remainder of the school year or at a time otherwise mutually agreed to and at the employee's option provided the Board is notified prior to July 10 of that year, it shall be for all of the succeeding school year.

On April 4, 1994, Superintendent Sittason wrote to the plaintiff to explain that the FMLA mandates payment of her insurance coverage from February 5, 1994 until April 30, 1994; however, after the date of April 30, 1994, the plaintiff would have to make monthly payments to maintain her insurance. Specifically, he wrote:

It is the Administration's understanding that the Family Medical Leave Act in your case began on February 5, 1994. The 12 weeks of the act would mandate payment by the Board of Education of its share of medical, dental and life insurance benefits through April 30, 1994. Your obligation will be $26.50 per month for medical and dental benefits and $3.92 per month for life insurance benefits. After the date of April 30, 1994, to maintain medical, dental and life insurance benefits will require monthly payments $546.12 for medical and dental benefits and $3.92 for life insurance. You will remain eligible to be on Board insurance throughout the remainder of your parental leave by paying to the Board of Education the established rate for medical, dental and life insurance and any increases in premiums as they become due. Payment for the insurance is due by the first

tion and subject to the provisions of the CBA.

day of each month. Therefore, we are returning your check of $550.04 dated March 31, 1994. Please remit payment of $26.50 and $3.92 for April coverage.

(Plaintiff's Exhibit 48.)

The plaintiff maintains that her performance evaluations deteriorated following her request for FMLA leave time. According to the plaintiff, in March 1990, Principal Rhoades ranked the plaintiff as excellent, outstanding or very good in all of the available categories; and wrote "you are doing a fine job and fitting in well with the rest of the staff." (Plaintiff's Exhibit 22.) In the winter of 1993–94, the tone of the evaluations changed and the plaintiff received several negative evaluations. For example, during her pregnancy, Principal Rhoades prepared an observation report that was generally positive, while containing some criticism of the plaintiff's work with a particular student. (Plaintiff's Exhibit 49.) On March 2, 1994, during the plaintiff's parental leave, Principal Rhoades issued an evaluation of the plaintiff, outlining necessary improvements and providing her with a one-year probationary contract. On March 16, 1994, the plaintiff responded to the negative points, disputing a December 16, 1993 teacher observation report. (Defendants' Exhibit J.)

The plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission on March 30, 1994. On April 14, 1994, Principal Rhoades issued a second evaluation letter containing additional negative comments pertaining to the plaintiff's job performance. (Plaintiff's Exhibit 9.) Ultimately, a one year probationary contract was offered to the plaintiff, which is permitted by the CBA after a teacher has been given a multi-year contract for "reasons that have been identified in the evaluation process." (Plaintiff's Exhibit 3.) Plaintiff returned to her former teaching position at the beginning of the 1994–1995 school year. (Defendants' Exhibit AA at p. 75.) After a plan had been developed in response to the evaluations, plaintiff was subsequently awarded a three year contract. (Defendants' Exhibit AA at pp. 76–77; 86–87.)

Plaintiff's action in this Court is based upon claims of (1) a violation of 42 U.S.C.

§ 2000e (Title VII) and O.R.C. § 4112.02, due to alleged sex discrimination and alleged retaliation; (2) a violation of the FMLA, 29 U.S.C. § 2601, *et seq.;* (3) a violation of 42 U.S.C. § 1983 (§ 1983); and (4) intentional inflection of emotional distress under Ohio law.

Defendants have moved for summary judgment on all of plaintiff's claims.

## II. SUMMARY JUDGMENT

Fed.R.Civ.P. 56(c) provides:

[Summary judgment] ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quire clear what the truth is ... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967

(1944)); *accord County of Oakland v.. City of Berkley*, 742 F.2d 289, 297 (6th Cir.1984).

In making this inquiry, the standard to be applied by the Court mirrors the standard for what was formerly referred to as a directed verdict. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson* 477 U.S. at 250, 106 S.Ct. 2505.

> "The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted." *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745, n. 11, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505. Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548(quoting Fed.R.Civ.P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (footnote omitted); *accord Adams v. Union Carbide Corp.*, 737 F.2d 1453, 1455–56 (6th Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). Inferences to be drawn from the underlying facts contained in such materials must also be considered in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Ass'n*, 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes*, 398 U.S. at 157–60, 90 S.Ct. 1598.

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

## III. DISCUSSION

### A. THRESHOLD ISSUE—THE COLLECTIVE BARGAINING AGREEMENT

Defendant, the Mount Vernon Board of Education (the Board) and the Mount Vernon Education Association (the Association), of which plaintiff was a member, following collective bargaining negotiations, entered into a CBA effective August 1, 1993 to June 30, 1995. The CBA contains provisions for resolution of grievances, defined as disagreements involving a work situation in which a teacher, group of teachers and/or the teachers association believe there has been a violation, misinterpretation or misapplication of the CBA or rules, regulations, and procedures of the administration and the Board. Step Four of the grievance procedure is arbitration and "the decision of the arbitrator is

binding on the parties." CBA § 201. In the present case, the teachers association did in fact file a grievance on behalf of plaintiff, which was based on the refusal of the superintendent to permit plaintiff to return to work on April 26, 1994; the grievance proceeded to arbitration. The grievance involved a dispute regarding the proper interpretation of the language in § 705 of the CBA and not the application of the FMLA or any other statute. The arbitrator held that grievance was not timely filed, but in what the arbitrator himself described as dictum, he concluded that the language of § 705 was clear and that it "most likely supports the Board's position that it was under no obligation to allow Ms. O'Hara to return midyear."

It is the defendants' position that all of plaintiff's claims are subject to the grievance procedures of the CBA and that, pursuant to those procedures and Ohio law, summary judgment should be rendered against plaintiff.

Defendants point out that O.R.C. § 4117.10(A) provides, in part, that, "an agreement between a public employer and an exclusive representative entered into pursuant to this chapter governs the wages, hours, and terms and conditions of public employment covered by the agreement" and that, "If the agreement provides for a final and binding arbitration of grievances, public employers, employees, and employee organizations are subject solely to that grievance procedure ..." That section also provides that, "Laws pertaining to civil rights ... prevail over conflicting provisions of agreements between employee organizations and public employers." [3]

The CBA further provides that:

This master contract supersedes and prevails over all statutes of the State of Ohio (except as specifically set forth in Section 4117.10(A) of the Ohio Revised Code), and all policies, rules, and regulations of the Board. (the "Supremacy" provision, CBA § 105).

**3.** Defendants have not referred to the Federal Arbitration Act, 9 U.S.C. §§ 1–15 (1988) nor

### 1. *Title VII Claims*

In the opinion of this Court, plaintiff is not required to submit her Title VII claims to arbitration and be bound by the arbitrator's decision. In *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) the Supreme Court specifically held that a plaintiff who had pursued a racial discrimination claim through arbitration under a collective bargaining agreement could still bring a Title VII claim in federal court; *See also, Barrentine v. Arkansas–Best Freight Sys. Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 480 (1984) (plaintiffs who had pursued a wage claim in grievance procedure under a collective bargaining agreement could still bring a Fair Labor Standards Act claim in federal court); *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1985) (plaintiff who had pursued wrongful discharge claim through arbitration under a collective bargaining agreement could still bring a § 1983 claim in federal court); *but cf., Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (plaintiff required to submit an Age Discrimination in Employment Act claim to arbitration pursuant to an employment agreement).

In *Gilmer,* the Supreme Court held that an arbitration clause in a registration form required for employment as a securities dealer and Rule 347 of the New York Stock Exchange Rules, which required arbitration of any controversy arising out of the dealer's employment be settled by arbitration, was enforceable under the Federal Arbitration Act, 9 U.S.C. §§ 1–15 (1988) (FAA) and that an action brought by a securities dealer for age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (ADEA) was subject to mandatory arbitration. In so holding, the Supreme Court did not overrule *Gardner–Denver,* but distinguished it as follows:

First, those cases (*Gardner–Denver* and its progeny) did not involve the issue of the enforceability of an agreement to arbitrate

moved to stay the present action pending arbitration. 9 U.S.C. § 3.

statutory claims. Rather, they involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable to the present case. Finally, those cases were not decided under the FAA, which, as discussed above, reflects a "liberal federal policy favoring arbitration agreements."

*Gilmer,* 500 U.S. at 35, 111 S.Ct. 1647.

In the same year *Gilmer* was decided, the Sixth Circuit applied *Gilmer* in a case brought by a securities dealer under the same arbitration provisions, but involving claims under Title VII and a state discrimination statute. The court found that the reasoning of *Gilmer* was equally applicable to a Title VII claim when an individual had agreed to arbitration as a condition of that person's employment. *Willis v. Dean Witter Reynolds, Inc.,* 948 F.2d 305 (6th Cir.1991).

The Supreme Court's decision in *Gilmer* has evoked sharp differences of opinion as to its effect on *Gardner–Denver.* A divided panel of the Fourth Circuit held that, under the language of a collective bargaining agreement, both plaintiff's Title VII claim based on sex discrimination[4] and her Americans with Disabilities Act claim[5] were subject to the arbitration provisions of the collective bargaining agreement and could not be brought in federal court. *Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875 (4th Cir.1996). The court relied on *Gilmer* and also emphasized a "Congressional favor towards arbitration," referring to the following section of the Civil Rights Act of 1991, amending Title VII, and to similar language that appears in the Americans with Disabilities Act:

"Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, minitrials, and arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title [enacting section 1981a of this title and amending this section, sections 1988, 2000e, 2000e–1, 2000e–2, 2000e–4, 2000e–5, 2000e–16, 12111, and 12112 of this title, and section 626 of Title 29, Labor]."[6]

A House committee report, in referring to this language, stated:

The Committee emphasizes, however, that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the Committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation of Title VII in *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The Committee does not intend this section to be used to preclude

---

**4.** With reference to sex discrimination, the CBA provided:

1. The Company and the Union will comply with all laws preventing discrimination against any employee because of race, color, religion, sex, national origin, age, handicap, or veteran status.

**5.** With reference to the ADA, the CBA provided:

2. This Contract shall be administered in accordance with the applicable provisions of the Americans with Disabilities Act. Before taking action relative to this Section, the Company will meet with the Local Union, and both parties will have sufficient opportunity to express their opinions regarding an anticipated action.

3. Any disputes under this Article as with all other Articles of this Contract shall be subject to the grievance procedure.

**6.** Section 118 of Title I of Pub.L. 102–166, *reprinted in,* notes to 42 U.S.C. § 1981.

rights and remedies that would otherwise be available.

H.R.Rep. No. 102–40(I), 102d Cong., 1st Sess. 97, *reprinted in* 1991 U.S.C.C.A.N. 549, 635.

In our circuit, the Fourth Circuit's conclusion concerning the effect of *Gilmer* on *Gardner–Denver* in a collective bargaining agreement case has been expressly rejected. In *Penny v. United Parcel Service*, 128 F.3d 408 (6th Cir.1997), the CBA, as in *Austin*, included provisions referring to non-discrimination against the handicapped employees and, specifically, "employees of a qualified disability under the Americans with Disabilities Act." In rejecting the defendant's claim that the federal court could not decide plaintiff's claim in view of the CBA's provision for submission of claims to the grievance procedure and binding arbitration, the court pointed out that *Gilmer* did not overrule *Gardner–Denver*, but had distinguished it for the reasons stated by the Supreme Court in *Gilmer*.

After noting that "*Austin* has not inspired many followers," referring to contrary decisions in the Second, Seventh, Eighth, Tenth, and Eleventh Circuits, the Sixth Circuit noted with approval the dissenting opinion in *Austin* which argued that, "although *Gilmer* permits an *individual* to waive his prerogative to pursue a statutory right in a judicial forum, that case does not alter *Gardner–Denver's* holding that a labor union cannot make such a waiver prospectively on an individual's behalf." *Id.* at 413. (emphasis in original.)

█ The Sixth Circuit then reached the following conclusion which, in this Court's view, clearly is applicable to the Title VII claims in the present case:

> We conclude that an employee whose only obligation to arbitrate is contained in a collective bargaining agreement retains the right to obtain a judicial determination of his rights under a statute such as the ADA.

*Id.* at 414

The conflict among the circuits regarding the effect of *Gilmore* on *Gardner–Denver* and the virtually simultaneously enactment of the 1991 amendments to Title VII, specifically Section 118 of Title I of Public Law 102–166 (*supra,* p. 878, fn. 6) continues unabated. In *Duffield v. Robertson Stephens and Co.*, 144 F.3d 1182 (9th Cir.1998), the plaintiff, a securities dealer, was required to agree to arbitration of all employment disputes under a registration agreement and Rule 347 of the New York Stock Exchange. The Ninth Circuit held, contrary to the Sixth Circuit's decision in *Willis*, after a thorough review of the legislative history of § 118, that Congress intended § 118 to codify the *Gardner–Denver* approach and to preclude the enforceability of compulsory arbitration agreements with respect to Title VII claims. One month later, in June, 1998, the Third Circuit decided that the same arbitration requirements imposed on a securities dealer were enforceable in a Title VII action. *Seus v. John Nuveen & Co., Inc.* 146 F.3d 175 (3rd Cir.1998). The court pointed out that, although *Gilmer* involved only ADEA claims, a number of courts have determined that the holding is equally applicable to Title VII proceedings, including the Sixth Circuit in *Willis*. With respect to § 118 of the Civil Rights Act of 1991, the Third Circuit expressly rejected the Ninth's Circuit's decision in *Duffield* and held that there is "nothing in the legislative history suggesting that this horatory provision was intended to codify, and thus freeze, any particular view of the case law." (referring, of course, to *Gardner–Denver*). The court cited with approval the *Austin* case from the Fourth Circuit as well as *Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 53 n. 4 (7th Cir.1995).

The Eighth Circuit, in *Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832 (8th Cir.1997) has drawn a sharp distinction between arbitration provisions in a collective bargaining agreement (as in *Gardner–Denver*) and individual employment agreements (as in *Gilmer*). The court noted the Supreme Court's concerns in *Gardner–Denver* that under a collective bargaining agreement the arbitration requirement is obtained by a union that represents the majority's interest rather than an individual's interest, which creates "tension between collective representation and individual statutory rights" and that la-

bor arbitrators are generally only authorized under a CBA to resolve contractual, and not statutory, claims. In contrast, the individual employment agreement in *Patterson* "[did] not limit the arbitrator solely to interpretation of the contract." *Id.* at 837. The court concluded that "the CBA cases, therefore, 'provide no basis for refusing to enforce [an individual consensual] agreement to arbitrate,'" paraphrasing language in *Gilmer*. The court then agreed "with those post-*Gilmer* decisions which have ruled that Title VII claims, like ADEA claims, are subject to individual consensual agreements to arbitrate," citing cases from the Fourth, Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits.[7]

The Court believes that *Gardner–Denver* is still the law; that the decision of the Sixth Circuit in *Penny* correctly applied *Gardner–Denver*; that Congress, in the 1991 amendments to Title VII did not intend to abrogate *Gardner–Denver*; and that plaintiff's clams under title VII are properly before this Court.

### 2. O.R.C. § 4112.02(A) Claim

■ Plaintiff's supplemental claim of discrimination under O.R.C. § 4112.02(A) is also properly before this Court.[8]

The reasoning of *Gardner–Denver* and *Barrentine* has been followed by the Ohio courts. In *Youghiogheny and Ohio Coal Co. v. Oszust*, 23 Ohio St.3d 39, 41, 491 N.E.2d 298 (1986), the Ohio Supreme Court said:

A private arbitrator's determination upholding an employee's discharge for "just cause" according to the terms of the applicable collective bargaining agreement does not preclude the Ohio Bureau of Employment Services from concluding that the employee was not "discharged for just cause in connection with his work" within the meaning of R.C. § 4141.29(D)(2)(a). Just as the United States Supreme Court has held that an employee's rights under

Title VII of the Civil Rights Act of 1964 were not foreclosed by submission of a discrimination claim to arbitration under the applicable collective bargaining agreement, *Alexander v. Gardner–Denver Co.* (1974), 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147, we conclude that by filing a claim for unemployment compensation, Oszust was "asserting a statutory right independent of the arbitration process." *Id.* at 54, 94 S.Ct. 1011. *See, also, Barrentine v. Arkansas–Best Freight Sys. Inc.* (1981), 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641; *McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984).

In a more recent case, and one which is more factually similar to the present case, an employee was discharged for not complying with the terms of a CBA governing a medical leave of absence. His union instituted the grievance procedures which culminated in a decision of the arbitrator finding that the discharge was proper under the terms of the CBA. The employee then brought an action in the Common Pleas Court alleging that he was discriminated against on the basis of his handicap in violation of O.R.C. § 4112.02 and was discharged in retaliation for filing his workers' compensation claim in violation of O.R.C. § 4123.90. In reversing the trial court's granting of defendant's motion for summary judgment, the Court of Appeals held that plaintiff was not precluded from asserting his claims by the arbitrator's denial of his grievance under the terms of the CBA. *Gardner v. Kelsey Hayes Co.*, 1995 WL 557004 (Ohio App. 5 Dist.1995). The court followed *Gardner–Denver, Barrentine,* and *Oszust* in reaching its conclusion:

Pursuant to these authorities, we find that appellant is not precluded from asserting his statutory wrongful discharge claims by the arbitrator's denial of his grievance under the terms of the collective bargaining

---

7. The 6th Circuit case, *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305 (6th Cir.1991), discussed *supra*, like most of those cited, involved arbitration requirements in securities dealers' employment agreements.

8. O.R.C. § 4112.02(A) provides:
 It shall be an unlawful discriminatory practice:

(A) For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, conditions, or privileges or employment, or any matter directly or indirectly related to employment.

agreement. In filing his complaint in the trial court, appellant is asserting independent statutory rights separate and apart from his contractual rights under the collective bargaining agreement. Although the arbitrator is empowered to determine the contractual rights of the parties pursuant to the terms of said agreement, he is not empowered to determine appellant's rights under O.R.C. § 4112.02 or § 4123.90. Further, the fact finding process of and potential remedies available in an arbitration proceeding are different from and more limited than those available to the appellant in a civil trial.

*Id.* at 3.[9]

### 3. FMLA Claims

■ In the context of a private employment agreement, it is not surprising to find decisions following *Gilmer* holding that FMLA claims covered by an arbitration agreement must be submitted to arbitration and not brought in court. In *Satarino v. A.G. Edwards and Sons, Inc.*, 941 F.Supp. 609 (N.D.Texas 1996), a district court, in dismissing plaintiff's ADA and FMLA claims, said:

This court predicts that the Fifth Circuit will follow the reasoning of courts that hold that parties who have contracted to do so can be compelled to arbitrate ADA claims, and that it will also uphold clauses that mandate arbitration of FMLA claims.

*Id.* at 612

The court, held that:

Although the FMLA, unlike the ADA, contains no explicit provision that encourages arbitration, *see* 42 U.S.C. § 12212, the section of the FMLA that confers a private right of action, 29 U.S.C. § 2617(a)(2), contains nothing to suggest that agreements to arbitrate are unenforceable and Satarino has not pointed the court to legislative

history to support such a conclusion, or to an inherent conflict between the FMLA and arbitration. The court therefore holds that contractual agreements to arbitrate FMLA claims are enforceable.

*Id.* at 613[10]

It should be noted that *Satarino* did not involve a collective bargaining agreement. The arbitration provision was contained in individual agreements and in Rule 37 of the New York Stock Exchange.

In *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272 (4th Cir.1997), the Fourth Circuit reversed a district court's denial of a motion filed under the Federal Arbitration Act to stay a FMLA action. Like *Satarino*, the agreement to submit "any and all complaints for any and all events that arise out of employment or termination of employment" was a condition of plaintiff's employment and not a part of any collective bargaining agreement. The Fourth Circuit, citing *Satarino*, held that "nothing in the Family and Medical Leave act suggests that Congress wishes to exempt disputes arising under it from the coverage of the FAA." *Id.* at 274.

The Fourth Circuit, in a case involving a collective bargaining agreement, distinguished *Gilmer* and its previous decisions in *Austin* and *O'Neil.* In *Brown v. Trans World Airlines,* 127 F.3d 337 (4th Cir.1997), an action brought under both Title VII and the FMLA, the court held that, "the question of whether a collective bargaining agreement submits statutory disputes to arbitration is a matter of contract law, and a 'party cannot be required to submit to arbitration any dispute which he has not agreed so to submit' because 'arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration..'" *Id.* at 340, citations omitted. Although the collective bargaining

---

**9.** While unpublished opinions of an Ohio Court of Appeals are not considered controlling authority, except under circumstances not applicable in this case, pursuant to Rule 2 of the Ohio Supreme Court Rules For The Reporting of Opinions, the Court is of the opinion that the reasoning of the *Gardner* case is a correct application of both federal and state law dealing with the issue in question.

**10.** 42 U.S.C. § 12212 provides:

Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, minitrials, and arbitration, is encouraged to resolve disputes arising under this chapter.

agreement in question included a prohibition against discrimination "on account of race, color, creed, religion, sex (sexual harassment), age, handicap, national origin or veteran status," the court focused on the provision for arbitration:

> But while the agreement provides for arbitration of "disputes between the Union, employee, and the Company growing out of the interpretation or application of any of the terms of this Agreement," the agreement does not purport to submit any noncontract-based dispute or any statutory dispute to arbitration. In this regard, the language in the agreement before us is significantly narrower than the language construed in *Gilmer, O'Neil,* and *Austin.*

*Id.* at 341

The Fourth Circuit made it clear that it was not retreating from the position it had taken in *Austin:*

> Nothing in our holding precludes the parties from agreeing to arbitrate all disputes arising out of the employment relationship by which they would be agreeing to arbitrate not only contract-based disputes but also disputes based on statutory and common law. To do so, they would not need to mention in their agreement that a statute was the source of a dispute committed to arbitration as long as it were made clear that their agreement is sufficiently broad to include the arbitration of such disputes. While it is true that the collective bargaining agreement in this case prohibits conduct similar to that prohibited by Title VII and by the Family and Medical Leave Act, none of the substantive provisions in the agreement reaches beyond the agreement to cover disputes arising under these laws. Thus, in interpreting the contract, there is no indication that the arbitrator would be bound to follow their interpretations. The defendants nevertheless argue that the anti-discrimination provisions in this case incorporate, *sub silentio,* an obligation to adhere to statutory anti-discrimination provisions.
>
> Although the anti-discrimination language of Brown's collective bargaining agreement prohibits many of the types of discrimination covered by existing laws, it cannot be said to be congruent with them. For example, the contractual provision prohibits discrimination, but it does not prohibit retaliation because of the enforcement of the antidiscrimination provision. Yet retaliation is the basis for a separate cause of action under Title VII and one that Brown seeks to vindicate in this case.

*Id.* at 341–342.

Although the Sixth Circuit has not yet decided the question, this Court is of the opinion that the plaintiff in this case cannot be compelled to submit her FMLA claims to arbitration under the CBA, and that her FMLA claims are properly before the Court for the following reasons. First, and of primary importance, the arbitration requirement is found in a collective bargaining agreement, and the concerns expressed by the Court in *Gardner–Denver* and followed by the Sixth Circuit in *Penny* are equally applicable here. Furthermore, the enforcement scheme of the FMLA "is modeled on the enforcement scheme of the FLSA, which has been in effect since 1938." Senate Report, p. 35. Many of the same considerations that led the Supreme Court to its conclusion in *Barrentine* regarding the right of an employee to pursue a FLSA claim in federal court would also apply to the right of an employee to pursue a claim under the sister statute, the FMLA, in federal court. Among the reasons given by the Supreme Court in *Barrentine* for holding that claims under the FLSA are not required to be submitted to binding arbitration under a collective bargaining agreement, following the reasoning of *Gardner–Denver,* was that a union might, without breaching its duty of fair representation, decide not to support the claim vigorously in arbitration. Also, because an arbitrator is required to effectuate the intent of the parties, rather than to enforce the statute, he may issue a ruling that is inimical to the public policies underlying the FLSA, thus depriving an employee of protected statutory rights. Furthermore, arbitrators are very often powerless to grant an aggrieved employee as broad a range of relief as afforded by the statute.

Second, the CBA in this case does not purport to require arbitration of any and all

grievances arising from plaintiff's employment. Under the CBA, a grievance is defined as "a disagreement involving a work situation in which a teacher, group of teachers or the MVEA believe there has been a violation, misinterpretation or misapplication of: A. The written Master Contract entered into between the Board and the WVEA; or B. Rules, regulations, and procedures of the administration and the Board." CBA § 202(2).[11] It does not include any claim arising under federal law, including claims arising under the FMLA.

Third, the CBA "supersedes and prevails over all statutes of the State of Ohio (except as specifically set forth in § 4117.10(A) of the Ohio Revised Code), and all policies, rules and regulations of the Board." CBA, § 105(1). Statutes of the United States are obviously excluded from this "supremacy" provision of the CBA.

■ Fourth, although the CBA provides that "the Board recognizes all personal rights and freedoms granted to teachers by the Constitution and the laws of the State of Ohio and the United States, and will abide by all laws that pertain to the teachers it employs (CBA § 401), such a provision does not, in the opinion of this Court, constitute a clear and unambiguous agreement to submit a grievance concerning conduct of the Board allegedly in violation of the FMLA to binding arbitration." The Board was contractually bound to follow the provisions of the CBA, including the provisions dealing with parental leave (CBA § 705), which allegedly conflict with the provisions of the FMLA. Failure of the Board to follow the provisions of § 705 of the CBA would itself constitute a clear violation of the CBA. The CBA contemplates that, in the case of a conflict between a provision of the CBA and any statute, "that provision shall automatically be deemed invalid." CBA § 105(2). It is apparent, therefore, that the CBA contemplated a legal action, as the present one, which challenges a provision of

the CBA as being contrary to law, in this case contrary to the FMLA.

This Court agrees with the court in *McGinnis v. Wonder Chem. Co.*, 1995 WL 756590 (E.D.Pa.1995), which held that plaintiff's claims under the ADA and FMLA were not preempted by an arbitration provision in the collective bargaining agreement.

Decisions in this area have branched in two directions: one following the reasoning of *Gilmer v. Interstate–Johnson Lane Corp.*, 500 U.S. 20 [55 FEP Cases 1116] (1991), which generally involves employment contracts between individual employees and their employers and the Federal Arbitration Act; and one adhering to the opinion in *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 [7 FEP Cases 81] (1974), which is applied to most cases involving collective bargaining agreements and not involving the Federal Arbitration Act. The facts of this case place it squarely in line with *Gardner–Denver* and its progeny: there is a collective bargaining agreement ("CBA") with a general arbitration provision, there is no incorporation of or reference to the Federal Arbitration Act, and plaintiff has brought this claim in an effort to secure his statutory rights, and not to settle a dispute governed solely by the CBA. "In holding that collective bargaining agreements do not require employees to submit statutory claims to grievance procedure, the Court made clear that contractual disputes arising out of the collective bargaining agreement itself are distinct and separate from an employee's statutory rights." *Randolph v. Cooper Indus.*, 879 F.Supp. 518 [68 FEP Cases 1465] (W.D.Pa.1994). Thus, defendant's argument for preclusion of plaintiff's statutory claims by the CBA is without merit.

*Id.* at fn. 1, p. 873.

### 4. § 1983 Claims

■ Finally, on the authority of *McDonald v. City of West Branch*, 466 U.S. 284,

---

11. As noted earlier, plaintiff's grievance which proceeded to arbitration involved a disagreement as to the interpretation of § 705 of the CBA dealing with parental leave and did not involve any question concerning defendants' liability under the FMLA. Furthermore, only grievances involving a violation, misinterpretation or misapplication of the CBA are grievable to binding arbitration; grievances which involve rules, regulations and procedures of the administration and the Board culminate in a hearing before the Board. CBA, § 201(3).

104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), the Court concludes that plaintiff's § 1983 claim is also properly before the Court and is not barred by the collective bargaining agreement. It does not follow, however, that plaintiff is able to assert a § 1983 claim in this case based upon a violation of Title VII or the FMLA, a question that is addressed *infra.*

The court turns, then, to the merits of defendants' motion with respect to plaintiff's claims under Title VII, under the FMLA, and under § 1983, as well as her supplemental clams under O.R.C. § 4112.02(A) and for intentional inflection of emotional distress under Ohio common law.

## B. TITLE VII AND O.R.C. § 4112.02(A)— ALLEGED DISCRIMINATION

Title VII and section 4112.02(A) of the Ohio Revised Code make it unlawful for an employer to discriminate against an individual on the basis of sex. Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1); Ohio Rev. Code § 4112.02(A).[12] Under both laws, discrimination on the basis of sex includes discrimination on the basis of pregnancy. Under the Pregnancy Discrimination Act (PDA), 42 U.S.C. § 2000e(k), enacted by Congress in 1978 as an amendment to Title VII, the terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions.

O.R.C. § 4112.01(B) provides that for the purposes of § 4112.02(A) discrimination, the terms "because of sex" and "on the basis of sex", include, but are not limited to, because of or on the basis of pregnancy, any illness arising out of and occurring during the course of a pregnancy, childbirth, or related conditions.

It should be noted, however, that with respect to the plaintiff's pregnancy sick leave—as distinguished from her parental leave—there is no claim that the CBA or defendants' practices regarding a sick leave based on pregnancy violated the PDA or O.R.C. § 4112.02(A).[13] Instead, the focus of plaintiff's Title VII and O.R.C. § 4112.02(A) claims of sex discrimination is the conduct of the defendants, not in granting her pregnancy sick leave, but in refusing her request during her subsequent parental leave to return to work on April 26, 1994. It is plaintiff's position that this refusal[14] was discriminatory because "it subjected only pregnant women teachers to the requirement that they obtain approval from the superintendent before returning to work." (Plaintiff's memorandum contra motion for summary judgment, p. 9). It is undisputed that defendants, in refusing to permit plaintiff to return to work during the remainder of the school year, were acting pursuant to the following provision in the CBA governing parental leave:

> If the first day of the leave is prior to January 1, the leave granted shall be for

**12.** 42 U.S.C. § 2000e–2(a)(1) provides:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

> O.R.C. § 4112.02(A) provides:

> It shall be an unlawful discriminatory practice: For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

> The Supreme Court of Ohio has held that federal case law interpreting Title VII of the Civil

Rights Act of 1964 is generally applicable to cases involving alleged violations of O.R.C. Chapter 4112. *Plumbers and Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n.*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981); *Ohio ex rel. Republic Steel Corp. v. Ohio Civil Rights Comm'n.*, 44 Ohio St.2d 178, 339 N.E.2d 658 (1975); *Weiner v. Cuyahoga Community College Dist.*, 19 Ohio St.2d 35, 249 N.E.2d 907 (1969), *cert. denied*, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970).

**13.** Article 7 of the CBA deals with leaves and includes provisions for disability leave, sick leave and parental leave. Pregnancy leave is governed by the sick leave provision (§ 708) and not by the disability provisions (§ 703). Parental leave is governed by § 705.

**14.** This refusal as a basis for plaintiff's claim of a violation of the Family Medical Leave Act (FMLA) is discussed *infra.*

the remainder of the school year or at a time otherwise mutually agreed to. If the first day of the leave is after January 1 in any school year, the leave shall be for the remainder of the school year or at a time otherwise mutually agreed to and at the employees option provided the Board is notified prior to July 10 of that year, it shall be for all of the succeeding school year.

CBA § 705.

Defendants contend that the Court need not consider plaintiff's claim under Title VII because "the case law is clear that Title VII does not prohibit discrimination on the basis of childbearing activities or parental leave," citing *Wallace v. Pyro Mining Co.*, 789 F.Supp. 867 (W.D.Ky.1990), *aff'd.* 951 F.2d 351 (6th Cir.1991) and *Barnes v. Hewlett–Packard Co.*, 846 F.Supp. 442 (D.Md.1994).

In *Wallace,* plaintiff sought leave to breast feed her baby, which leave was refused by the employer. Plaintiff claimed this constituted discrimination on the basis of sex. The court held that plaintiff's claim did not come within the ambit of the PDA because plaintiff could not show that she had a "related medical condition" as required by the Act. In *Barnes,* plaintiff was given parental leave following the birth of a child in accordance with the employer's policy. She claimed that when she returned to work she was met with sex discrimination because she had availed herself of parental leave. The Court held that her parental leave did not come within the coverage of the PDA and because parental leave was not protected by Title VII it could not be used as a basis for the alleged discrimination.[15]

■ *Wallace* is readily distinguishable from the present case. While an employer (pre FMLA) did not have to grant parental leave to a female employee to care for a newborn child and could treat the employee in the same manner as any other employee who did not have a disability and is not covered by the PDA, as *Wallace* so held, the PDA did not affect or narrow Title VII's prohibition against an employment practice that discriminates against any employee be-

cause of that person's race, color, religion, sex or national origin. The PDA was enacted by Congress as a result of Supreme Court decisions, particularly *Gen. Elec. Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), *rehearing denied,* 429 U.S. 1079, 97 S.Ct. 825, 50 L.Ed.2d 800 (1976), and to make it clear that sex discrimination under Title VII included discrimination based on pregnancy, child birth or related medical conditions. In short, the PDA obviously did not in any way restrict the prohibition against gender based discrimination in Title VII; it clarified that protection by expressly including discrimination based on pregnancy, child birth or related medical conditions. This is illustrated by the EEOC Guidelines Questions and Answers on the PDA, quoted in the *Barnes* case as follows:

Q. Must an employer grant leave to a female employee for childcare purposes after she is medically able to return to work following leave necessitated by pregnancy, childbirth or related medical conditions? A. While leave for childcare purposes is not covered by the Pregnancy Discrimination Act, ordinary Title VII principles would require that leave for childcare purposes be granted on the same basis as leave which is granted to employees for other non-medical reasons. For example, if an employer allows its employees to take leave without pay or accrued annual leave for travel or education which is not job related, the same type of leave must be granted to those who wish to remain on leave for infant care, even though they are medically able to return to work.

*Barnes,* 846 F.Supp. at 444.

■ As a result of the PDA, there are now, as one court has referred to it, two prongs of sex discrimination, "the gender and pregnancy prongs of ... Title VII" *Fejes v. Gilpin Ventures, Inc.,* 960 F.Supp. 1487 (D.Col.1997) and, in an appropriate case, both prongs must be analyzed. In the present case, the court is not concerned with the second prong. The plaintiff has made no claim of discrimination based on her pregnancy sick leave or the PDA. The claim is

---

**15.** The Court notes, parenthetically, that neither case involved the FMLA.

that the employer, in providing for parental leave for both male and female employees has imposed restrictions (requiring approval before returning to work) that are not applied to the other types of leave set forth in the CBA, and that this discriminates against female employees. This is clearly a claim of gender discrimination—the gender prong of sex discrimination—and is within the coverage of Title VII. To the extent that *Barnes* can be read to the contrary, the Court respectfully disagrees. The Court turns, then, to a consideration of plaintiff's claim.

Plaintiff contends that requiring employees who take parental leave to remain on leave until the next school year, unless an earlier return date is mutually agreed upon (requiring, presumably, the Superintendent's agreement), discriminates against women because (1) such a requirement is not imposed with reference to leaves based on disability and (2) "a woman is much more likely to take parental leave than a man." (Plaintiff's memorandum contra motion for summary judgment, p. 13.)

■■■ The plaintiff sets forth her Title VII discrimination claim as both a disparate treatment claim and an adverse impact claim. A violation of Title VII can occur either when an employer treats a female employee less favorably than a similarly-situated male employee, or when an employer institutes a facially neutral policy that disproportionately affects female employees. "Disparate treatment ... is the most easily understood type of discrimination [and involves an] employer simply treat[ing] some people less favorably than others because of their race, color, religion, sex, or national origin."[16] *Int'l. Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Adverse impact involves the existence of an employment practice which, although neutral on its face, has the effect of disproportionately af-

fecting persons in a legally protected group.[17] *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

### 1. Disparate Treatment

■■■ The fact that the CBA required that parental leave be extended until the following school year, absent approval for an earlier return, whereas approval for return from disability leave is not required, does not establish a *prima facie* case of discrimination. Plaintiff has not offered any evidence that defendants treated plaintiff differently from male employees who also were subject to the requirements imposed for parental leave. Plaintiff's comparison with male employees who took disability leave and did not require approval before returning to work is meaningless. The provisions for disability leave and parental leave are different, and plaintiff, to show disparate treatment discrimination, must show that she was treated differently than males under the provisions dealing with parental leave. There is no evidence that this occurred. Plaintiff, in short, has not presented any evidence of disparate treatment based on her gender.

### 2. Disparate Impact

■■ Plaintiff's contention that the facially neutral requirement in question has a disparate impact on women because "a woman is much more likely to take parental leave than a man" presents a somewhat more difficult question, not because of this conclusory statement of counsel but because of the undisputed "statistical evidence." Defendant Rhoades estimated that seven or eight female employees other than plaintiff had taken parental leave (Rhoades depo., p. 21) and that no male teachers had ever taken parental leave. *Id.* at 20. Defendants, conceding that plaintiff was one of eight female employees who took parental leave and that no male

---

16. To prove a *prima facie* case of disparate treatment under both Title VII and Ohio law, plaintiff must prove: (1) that she is a member of a protected class; (2) that she was qualified for the job; (3) that adverse employment action was taken against her; and (4) that she was treated differently than similar situated male employees. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

17. A *prima facie* case of adverse impact is established when: (1) plaintiff identifies a specific employment practice to be challenged; and (2) through relevant statistical analysis proves that the challenged practice has an adverse impact on a protected group. *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 907–8 (6th Cir.1991).

employee has taken parental leave, contend that "it is not Defendants' fault that no males have decided to request parental leave ..." (Defendants' reply memorandum, p. 3.)

■ In order to establish a *prima facie* case of discrimination by showing disparate impact, the plaintiff, after identifying the employment practice being used by the employer, must then show an adverse effect caused by the employment practice by offering statistical evidence of a kind and degree sufficient to show that the practice in question has caused prohibited discrimination. *Abbott v. Fed. Forge, Inc.*, 912 F.2d 867, 872 (6th Cir.1990). As the Sixth Circuit said in *Abbott*, the Supreme Court has rejected any mathematical formula in analyzing statistics, and "Courts are left to decide on a case-by-case basis whether statistics that purport to show disparate impact are in fact sufficient to the task..." *Id.* at 873.

■ In the present case, the only relevant statistical evidence offered by plaintiff is the fact that in one elementary school in the Mt. Vernon school district eight female teachers applied for parental leave and no male teachers applied for parental leave.[18] This statistic, standing alone, has virtually no probative value. First, with respect to the composition of the teaching staff at Dan Emmett Elementary School, there are no statistics showing the gender composition of that staff. If, for example, 90% of the teachers at this school are female, the fact that most, if not all, of the teachers who applied for leave were female would hardly support any inference of discrimination due to disparate impact.[19] Second, the court questions the use of one school in the entire school district as a basis for the statistical foundation needed in a disparate impact case. The challenged employment practice is contained in the CBA between the Mt. Vernon Board of Education and the Mt. Vernon Education Association. There are presumably a number of schools in the Mt. Vernon school district, and the challenged employment practice encompasses all teachers at all schools in the district. The relevant group for statistical purposes, in the view of the Court, would be all female and all male teachers in the school district who took parental leaves and who requested a return to work but were denied that request because of the challenged requirement that approval first be obtained. "The statistical evidence may be found lacking if there is a small amount or incomplete data..." *Minority Employees of the Tennessee Dep't. of Employment Sec., Inc. v. State of Tennessee, Dep't. of Employment Sec.*, 1989 WL 74523, *7 (6th Cir.1989). Plaintiff has failed to present sufficient statistical evidence to create a *prima facie* case of discrimination based on disparate impact.[20]

18. It is questionable whether the absence of male employees taking parental leave could be used, in the first instance, as any basis for any statistical analysis. In *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 651–652, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), the Supreme Court held that an employer's hiring practice would not have a disparate impact on non-whites where the absence of non-whites holding the skilled jobs reflected a dearth of qualified non-white applicants, for reasons that were not the employer's fault. By analogy, it could be found—as defendants argue—that the fact that no men have been required to seek the superintendent's approval before returning to work after parental leave simply reflects a dearth of men taking parental leave, for reasons that are matters of family choice—a choice that is not the fault of the defendants. The Court, nevertheless, will consider the adequacy of plaintiff's statistical evidence.

19. Plaintiff argues that, "Historically, the occupation of elementary education teachers has been overwhelmingly predominated by women" (Plaintiff's memorandum in opposition to motion for summary judgment, p. 15), and supports this by statistics showing that in Ohio 61% of teachers are women, 29% are men (Plaintiff's Exhibit 52) and that in the United States there are three times more women teachers than men teachers (Plaintiff's Exhibit 51). Plaintiff contends, therefore, that the challenged practice in question "Has a disproportionately adverse effect on women employees of the district." *Id.* The fact that an employment practice affects more female employees, however, is not evidence that the practice is discriminatory. An absolutely nondiscriminatory practice will have that result if a majority of the workforce happens to be women. The question is not how *many* female employees are affected by a particular employment practice, but whether that practice has a *disproportionate* effect on the female employees in order to create an inference that the practice has resulted in discrimination.

20. *Scales v. J.C. Bradford and Co.*, 925 F.2d 901 (6th Cir.1991) points out that the entire evidence in the record must be considered. In finding that plaintiff in that case had presented sufficient evidence to establish a *prima facie* case of dispa-

Because plaintiff has failed to establish a *prima facie* case of sex discrimination under either a disparate treatment or disparate impact analysis as is her burden under both federal and state law, the court will grant defendant's motion for summary judgment on plaintiff's claim of sex discrimination under Title VII and O.R.C. § 4112.02(A).

## C. TITLE VII—ALLEGED RETALIATION

Plaintiff contends that defendants engaged in retaliatory conduct after she filed a Title VII charge of discriminatory conduct with the Ohio Civil Rights Commission on March 30, 1994, asserting that she had been subjected to disparate treatment since taking pregnancy leave on January 10, 1994. (Complaint, ¶ 11.) It is alleged that since filing the charge of discrimination she has been unfairly scrutinized on a continuing basis, has received inaccurate job performance evaluations, has been threatened with termination, and has been subjected to hostile and demeaning comments. (Complaint, ¶¶ 11 & 12.)

Defendants point out that virtually all of the alleged conduct upon which plaintiff bases her claim of retaliation for filing a Title VII charge with the Ohio Civil Rights Commission on March 30, 1994 occurred *prior* to that date and, therefore, obviously could not be the basis for plaintiff's retaliation claim. It is not disputed that defendants performed two observations of plaintiff in November and December 1993, which led to the evaluation letter of March 2, 1994 which, in turn, recommended that plaintiff be placed on a one year probationary contract. (App.Ex.5.)

Plaintiff, in response, argues that some of the alleged conduct upon which plaintiff bases her retaliation claim took place after she filed her Title VII charge with the OCRC, *i.e.* a second performance evaluation on April 14, 1994, a refusal to accept plaintiff's "rebuttal" of the March 2, 1994 evaluation letter, the refusal to permit plaintiff to return to work on April 26, 1994, and the placing of plaintiff on a one year probationary contract on June 6, 1994. (Plaintiff's memorandum contra motion for summary judgment, pp. 7–8.)

Plaintiff also argues that defendants' alleged discriminatory conduct prior to the filing of the OCRC charge should be considered because she engaged in protective activity when she requested parental leave on January 28, 1994 and asserted her rights under the FMLA. The problem with this argument, however, is that (1) plaintiff's complaint is specifically based on a Title VII claim of retaliation following the filing of her OCRC charge, and (2) plaintiff's complaint does not contain a cause of action based on a claim of retaliation for protected activity under the FMLA.

In order to establish a *prima facie* claim of Title VII retaliation, the plaintiff must allege and prove that she:

(1) engaged in an protected activity; (2) that this exercise of his [or her] protected rights was known to defendant; (3) that defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990), *cert. denied*, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990).[21]

The first and second elements are not disputed. Plaintiff's filing of her complaint with the OCRC was protected activity and was known to defendants. As to the third prong, the plaintiff contends that the defendants did

---

rate impact discrimination, the court found that the statistical evidence, *coupled* with the other evidence in the record, was sufficient in that case. Plaintiff in the present case has not presented sufficient statistical evidence nor has she coupled the statistical data with any other evidence that would tend to show that the administration of the parental leave provisions results in a disparate impact.

**21.** *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1325 (10th Cir.1997), *Oswalt v. Sara Lee Corp.*, 889 F.Supp. 253–259 (N.D.Miss.1995), *aff'd*, 74 F.3d 91 (5th Cir.1996) (applying Title VII proof pattern for claims of retaliation under the FMLA); *Dodgens v. Kent Mfg. Co.*, 955 F.Supp. 560 (D.S.C.1997) (claim for retaliatory discharge under FMLA analyzed same as retaliation claim under Title VII); *McCown v. UOP, Inc.*, 1995 WL 519818 (N.D.Ill.1995).

take adverse employment action; specifically, the plaintiff received a negative evaluation after she filed her OCRC complaint; her return date was delayed until the next calendar school year; and she received a one-year probationary contract for that year. Construing the evidence in the light most favorable to plaintiff as the non-moving party, this Court finds that, for purposes of defendants' motion for summary judgment, that defendants' actions constitute adverse employment action.

■ With respect to the fourth element, it is highly questionable that plaintiff's evidence is sufficient to show any causal connection between the filing of the OCRC charge and the alleged retaliatory events following the filing of that charge. Although plaintiff received another unfavorable evaluation in April, 1994, she had received an unfavorable evaluation prior to the filing of the OCRC charge; the refusal of defendants to agree with plaintiff's "rebuttal" of the evaluation can hardly be deemed a retaliatory act; the refusal to permit plaintiff to return to work on April 26, 1994 was clearly based on the CBA; and the placing of plaintiff on a one year probationary contract was simply the result of a recommendation made prior to the filing of the OCRC charge.

■ Even if plaintiff has established a *prima facie* case of retaliation—and the Court does not believe she has—the inquiry would not end there. Once a plaintiff has established a *prima facie* case, the employer must then articulate some legitimate reason for its actions. *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the employer meets this burden of production, the plaintiff, who bears the ultimate burden of persuasion throughout the entire process, must then demonstrate "that the proffered reason was not the true reason for the employment decision" but was mere pretext. *Id.* at 256, 101 S.Ct. 1089. "Accordingly, once the employer has come forward with a nondiscriminatory reason [for the adverse action], . . . the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078 (6th Cir.1994).

■ Defendants have provided deposition testimony regarding the alleged deficiencies of the plaintiff's teaching performance to support defendants' contention that the evaluations she received and the placing of plaintiff on a probationary status for one year were legitimate non-discriminatory actions by defendants. Specifically, the criticisms in the evaluation are confirmed by deposition testimony from two teachers who substituted for the plaintiff,[22] two former members of the Mt. Vernon Board of Education [23] and the Coordinator of Special Education.[24] Based on this testimony, the Court finds that defendants have put forward a legitimate reason for their actions.

---

**22.** The defendants point to the depositions of Lori Snyder and Betty Spohn who both served as substitutes for the plaintiff. Lori Snyder explained that the plaintiffs classroom was disorganized and that she could not locate the Individualized Education Plans for the students. (Defendant's reply brief, pp. 8–10). Ms. Snyder further confirmed that the plaintiff's aide, Margaret Frazier, complained that she often did not get a lunch break because of the plaintiff's tardiness and absenteeism. (*Id.*)

**23.** Kathy Bomba, a former board member of the Mt. Vernon School District Board of Education, testified that, prior to the institution of this lawsuit, she received several anonymous calls from parents advising that the plaintiff did not spend enough time in the classroom with the children and that the sole responsibility of the students fell upon the shoulders of the plaintiff's aide, Margaret Frazier. (Defendant's reply brief, pp. 8–10.) Also, Nick Houston, another former Board member testified that he was aware of the criticism of the plaintiff and that, from his own observations when he passed her classroom, she was often seated in her chair and was not interacting with the children. (*Id.*)

**24.** Dr. Joan Stallard, the Coordinator of Special Education for the Mt. Vernon School District, supervised the special education teachers, and reported directly to Superintendent Sittason. (Defendant's reply brief, pp. 8–10). Dr. Stallard noted that the plaintiff was very distant with her students, she was disorganized, she was not as warm and caring with the students as a teacher of handicapped children needs to be and, perhaps most importantly, the plaintiff's attendance was problematic. (*Id.*)

If the employer meets the burden of articulating a legitimate reason for the adverse action, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the reason proffered by the employer was not its true reason, but merely a pretext for discrimination. *McDonnell–Douglas; Burdine.* Plaintiff has failed to produce any evidence from which a reasonable jury could find that defendants' reasons for the questioned conduct were mere pretext. The unfavorable evaluations of plaintiff commenced before the filing of her OCRC charge, and she has failed to present evidence that those evaluations were not valid.[25] Plaintiff has presented no evidence that would tend to prove that defendants' refusal to accept her criticism of the evaluations or the refusal to permit her to return to work, based on the CBA, were pretextual. Finally, as noted earlier, the placing of plaintiff on probationary status was based on a recommendation made before the filing of the OCRC charge. Furthermore, it is undisputed that plaintiff was never terminated from her position and, in fact, was given a full three-year contract after her probationary period ended.[26]

For the above reasons, the Court will grant defendants' motion for summary judgment on plaintiff's Title VII claim of retaliation.

## D. THE FAMILY AND MEDICAL LEAVE ACT

The Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*, is intended to provide a "sensible response to the growing tensions between work and family" by "establishing a right to unpaid family and medical leave for all workers covered by the act." S.Rep. No. 3, 103d Cong., 1st Session 3–5 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 5–7. The FMLA requires employers to provide their employees with the rights established by the FMLA notwithstanding the existence of a collective bargaining agreement: "The rights established for employees under this Act or any amendment made by this Act shall not be diminished by any collective bargaining agreement or any employment benefit program or plan." 29 U.S.C. § 2652(b).

### 1. Notice.

 The defendants argue that the plaintiff did not provide adequate notice in her request for FMLA leave because both the form of the notice and the timing of the notice were inadequate. First, this Court notes that an employee is not required to ask for FMLA leave specifically, but must merely provide a minimal level of information about the need for leave. *See* 29 U.S.C. § 2612(e)(1) and (2) and 29 C.F.R. § 825.301 and § 825.303; 58 Fed.Reg. 31794, 31806 (Interim Regulations) (§ 826.302 and § 825.303). *See also, Manuel v. Westlake Polymers Corp.*, 66 F.3d 758 (5th Cir.1995). Furthermore, in the exchange of correspondence, defendants repeatedly refer to the FMLA. Therefore, it is incongruous for the defendants to claim that the plaintiff failed to provide adequate notice; defendants never informed the plaintiff that her request for FMLA leave was untimely, and the exchange letters outline a protracted discussion of details necessary to the FMLA, *i.e.* insurance coverage, etc. The notice need only briefly state why the employee requires leave and, in the case of foreseeable leave, it should state the length of leave requested. *See, Hammon v. DHL Airways, Inc.*, 980 F.Supp. 919 (S.D.Ohio 1997); *Brannon v. OshKosh B'Gosh, Inc.*, 897 F.Supp. 1028, 1038 (M.D.Tenn.1995); *Reich v. Midwest Plastic Eng'g* ., 1995 WL 514851 (W.D.Mich.1995). Once an employee requests leave, the employer bears the burden of requesting any additional information it needs.

The particular evidence in that case showed that plaintiff had clearly established a *prima facie* case of retaliation and, although the employer had articulated legitimate reasons for its decision, there was ample evidence from which a jury could find that those articulated reasons were pretextual.

---

**25.** The fact that she received favorable evaluations in the past does not refute the validity of the evaluations made in 1994.

**26.** *Holland v. Jefferson Nat. Life Ins.*, 883 F.2d 1307 (7th Cir.1989) does not support plaintiff's claim. In *Holland*, an employee who had complained about sexual misconduct of a supervisor was terminated after she took maternity leave.

### 2. Plaintiff's Entitlement to Twelve Weeks of Parental Leave Beginning February 5, 1994

There was some initial confusion on the part of the defendants in their response to plaintiff's request for parental leave beginning February 2, 1994. Director Truman informed plaintiff that she had used 5.1 weeks of sick leave which would be deducted from the twelve weeks of FMLA parental leave and that her parental leave would expire on March 18, 1994. The ultimate position of the defendants—and one the Court finds to be correct—was that plaintiff's FMLA leave began on February 5, 1994 and was for twelve weeks ending April 30, 1994.

█ The FMLA, enacted February 5, 1993 and effective August 5, 1993, provided for a delayed effective date of February 5, 1994 for employers who were subject collective bargaining agreements.[27] The defendant Board of Education was subject to a collective bargaining agreement when the Act became effective, and therefore on February 5, 1994 the board was required to grant plaintiff twelve weeks of unpaid leave. Furthermore, although consideration was given to deduction of prior leave taken by an employee, this was rejected in the regulations, which provide that only leave taken after the employer is subject to the FMLA is counted for a determination of the twelve week period, and prior leave is not to be deducted.[28]

The heart of the dispute in regard to plaintiff's claim under the FMLA, however, is not over her entitlement to twelve weeks of parental leave commencing February 5, 1994, but in the refusal of defendants to permit her to return to work at the end of her parental leave and to restore her to the position she held prior to the leave.

### 3. The refusal to permit plaintiff to return to work on April 26, 1994.

Plaintiff contends that the defendants violated the FMLA by refusing to allow her to return to work on April 26, 1994, after her FMLA leave. The FMLA has special provisions for local education agencies, because "the entitlement to leave for family reasons presents unique challenges to schools, as the teachers' right to leave must be balanced against the students' right to continuity in the classroom." S.Rep. No. 3, 103d Cong., 1st Ses. 3–5 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 5–7. Local educational agencies are permitted to require employees taking leave to continue leave until the end of an academic term if:

A) The leave is of at least three weeks duration; and

B) The return to employment would occur during the three week period before the end of such term.

29 U.S.C. § 2618(d)(1).

It is undisputed that Superintendent Sittason, acting in accordance with CBA § 705(a),

---

**27.** Section 405 of Pub.L. 103–3; 29 C.F.R. § 825.102(a).

**28.** The Department of Labor interim regulation in effect August 5, 1993 provided:

How Does the Act Affect Leave in Progress, on, or Taken Before, the Effective Date of the act? (§ 825.103)
Because both the leave entitlement and notice provisions of the act are not effective until August 5, 1993, only leave starting on and after that date is considered FMLA leave which can be counted against an employee's 12–week entitlement. Alternatives suggested by comments, but not adopted, include: (1) Only leave requested on or after the Act's effective date should count; (2) leave beginning before the Act takes effect and continuing on the effective date should all be counted against the 12–week entitlement; and (3) any leave taken for FMLA-eligible purposes over the prior 12–month period before the Act's effective date

should be counted towards the 12–week entitlement. It is recognized that the regulation may allow some opportunity for leave-stacking, e.g., where an employee has already taken leave to which the employee is entitled under State law or the employer's plan. However, this circumstance will exist only in the initial implementation and transition period.
58 Fed.Reg. 31794, 31796
The final regulation in effect April 6, 1995 provided:
An eligible employee's right to take FMLA leave began on the date that the act went into effect for the employer ... Any leave taken prior to the act's effective date may not be counted for purposes of FMLA. If leave qualifying as FMLA leave was under way prior to the effective date of the act and continued after the Act's effective date, only that portion of leave taken on or after the Act's effective date may be counted against the employee's leave entitlement under the FMLA.
29 C.F.R. § 825.103(A)

required plaintiff to remain on parental leave for the balance of the school year which ended June 3, 1994. Defendants contend that because the determination of the plaintiff's date of return was based on the CBA, their decision was correct.

■ There is, however, ·a clear conflict between the CBA and the FMLA regarding the right of a teacher to return to work at the end of his or her parental leave.[29] While the FMLA permits a school district to refuse a return to work if that return would occur during the three week period before the end of the school term, the CBA requires that any parental leave taken after January 1 in any school year must be for the entire remainder of the school year unless an earlier return is mutually agreed upon. Defendants were required to comply with the FMLA; the CBA, while a possible basis for mitigation of damages,[30] is not a basis for a failure to comply with the federal law.

■ Plaintiff's return date of April 26, 1994 was prior to the three week period before the end of the school term on June 3, 1994. Plaintiff requested that she return to work on April 26, 1994, pursuant to her rights under the FMLA, and a refusal to permit her return on that date, in reliance on the CBA, would constitute a violation of 29 U.S.C. § 2614(a)(1) which requires on employer to restore the employee to the same or equivalent position "on return from such leave." The refusal to permit plaintiff to return from her leave, in reliance on a CBA whose provisions conflicted with the FMLA, imposed a condition not authorized by the Act and was in violation of the Act.

■ During an employee's FMLA leave, the employer is obligated to maintain group health coverage for the employee if such coverage was provided prior to the leave. 29 U.S.C. § 2614(a)(2). The defendants, in fact, belatedly acknowledged their duty to pay premiums for the plaintiff's health insurance for the month of April. On April 4, 1994, Superintendent Sittason confirmed in a letter to plaintiff that the Act became effective on February 5, 1994, and that as of that date, she was entitled to coverage of health benefits for a twelve week period. The Court finds that this is a correct interpretation of the FMLA, and that defendant Board met its responsibility by continuing coverage of plaintiff's health benefits for a twelve week period beginning February 5, 1994 and ending April 30, 1994.

For the foregoing reasons, defendants' motion for summary judgment on plaintiff's FMLA claim is **DENIED**.

### E. PLAINTIFF'S CLAIMS UNDER 42 U.S.C. § 1983

Defendants contend that "plaintiff does not have a case under 42 U.S.C.

---

**29.** 29 U.S.C. § 2614(a) requires that an eligible employee who takes parental leave is entitled, on return from such leave, to be restored by the employer to the position of employment held by the employee when the leave commenced or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. With respect to local educational agencies, the determination regarding the restored position "shall be made on the basis of established school board policies and practices, private school policies and practices, and collective bargaining agreements." 29 U.S.C. § 2618(e). The defendants clearly had the right to determine the plaintiff's position on her return from leave—including the probationary status— in accordance with the Board's policies and practices and the CBA. The conflict with the CBA results not from plaintiff's restored position but from the fact that the CBA prevented plaintiff from returning from parental leave under terms that conflict with those authorized by 29 U.S.C. § 2618(d)(1).

**30.** 29 U.S.C. § 2618(f) provides:

(f) Reduction of amount of liability
 If a local educational agency or a private elementary or secondary school that has violated this subchapter proves to the satisfaction of the court that the agency, school, or department had reasonable grounds for believing that the underlying act or omission was not a violation of this subchapter, such court may, in the discretion of the court, reduce the amount of the liability provided for under section 2617(a)(1)(A) of this title to the amount and interest determined under clauses (i) and (ii), respectively, of such section.
 The Senate Report, in referring to this section, states: "Reasonable grounds under subsection (f) of section 108 could include such factors as advice of counsel, collective bargaining agreements, and compliance with valid State and local laws, the laws referenced in 108(b) and regulations or policies promulgated by the Department of Labor." Senate Report, p. 37. The Court expresses no opinion regarding the applicability of this provision in the present case.

§ 1983,[31] and, therefore, such claims must be dismissed on summary judgment." It is defendants' argument that, "because a non-tenured teacher has no property interests, a § 1983 claim is not proper because, in such a case, the record is devoid of any rights, privileges or immunities secured by the Constitution and the laws of the United States" citing *Ryan v. Aurora City Bd. of Educ.*, 540 F.2d 222 (6th Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977). *Ryan* involved a § 1983 action by a teacher alleging a deprivation of due process rights under the 14th amendment. The Court held that a non-tenured teacher had no expectation of continued employment, and hence no property interest, under state law, to be protected by the 14th Amendment.[32]

 It is well-established however, that 42 U.S.C. § 1983 covers not only a denial of rights secured by the Constitution, but also a denial of rights created by federal statutes. *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Day v. Wayne County Bd. of Auditors*, 749 F.2d 1199, 1202 (6th Cir.1984). It is undisputed that an employee has a civil right of action under FMLA. 29 U.S.C. § 2617(a)(1). The question is whether Congress intended that cause of action to be an employee's exclusive remedy. As the court said in *Knussman v. State of Md.*, 935 F.Supp. 659 (D.Md.1996):

> It is well-established that 42 U.S.C. § 1983 can provide a cause of action for the denial of rights created by federal statutes. *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). While the Supreme Court has held repeatedly that the reach of § 1983 should be broadly construed, *Golden State Transit v. City of Los Angeles*, 493 U.S. 103, 105, 110 S.Ct. 444, 447–48, 107 L.Ed.2d, 420 (1989), the Court has recognized two exceptions to the appli-

cation of § 1983 to statutory violations: (1) where the statute does not create enforceable rights within the meaning of § 1983; and (2) where Congress has foreclosed § 1983 enforcement in the language of the statute itself. *Golden State*, 493 U.S. at 106, 110 S.Ct. at 448–49. *Middlesex County Sewerage Authority v. National Sea Clammers Assn.*, 453 U.S. 1, 19, 101 S.Ct. 2615, 2625–26, 69 L.Ed.2d 435 (1981); *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 101, S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Smith v. Kirk*, 821 F.2d 980, 982 (4th Cir.1987).

The defendants have not argued that Congress intended that the remedies for enforcement of rights under FMLA should be the exclusive remedies available to plaintiff, nor have defendants cited any authority to that effect. Nevertheless, there is authority that would support this argument. In *Jolliffe v. Mitchell*, 971 F.Supp. 1039, 1044–1045 (W.D.Va.1997), the Court dismissed a § 1983 claim that was joined with a FMLA claim, based upon the following reasoning:

> Plaintiff objects to the conclusion of the magistrate judge that the FMLA created a comprehensive scheme of enforcement which, therefore, precluded a section 1983 claim based on the FMLA violation. Plaintiff's objection is without merit. The FMLA focuses on very specific injuries and delineates narrowly the remedies for those injuries. Section 2612 of the Act defines the leave which employers are required to give to their employees under certain circumstances. Section 2615 outlines the prohibited acts under the FMLA and Section 2617 provides a comprehensive remedial scheme which allows for action either by employees themselves or by the Secretary of Labor on behalf of employees whose rights have been violated. Because

---

**31.** Section 1983 provides:

> Every person, who under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law,

suit in equity, or other proper proceeding for redress.

**32.** *Cf. Jolliffe v. Mitchell*, 971 F.Supp. 1039 (W.D.Va.1997) in which the court said: "while plaintiff may have had no property interest in her continued employment in and of itself, she did have a property interest, created by the FMLA, in not being dismissed because of her medically necessary absence."

the injuries to which the Act applies are narrowly drawn and the remedies provided fully cover those injuries, the magistrate judge correctly determined that the FMLA provides a comprehensive enforcement scheme which forecloses a section 1983 claim. Plaintiff's objection to the dismissal of her section 1983 claim is denied.

On the other hand, the court in *Peterson v. Slidell Memorial Hosp. and Medical Center,* 1996 WL 732840 (E.D.La.1996) held that: plaintiff properly alleges violations of Title VII and the Family and Medical Leave Act; these violations of federal law support a cause of action under § 1983. Therefore, defendants' motion to dismiss plaintiff's § 1983 claims is denied.

In *Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199 (6th Cir.1984), the Sixth Circuit, following the reasoning of the Supreme Court in *Great Am. Fed. Sav. and Loan Ass'n. v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), held that Title VII provides the exclusive remedy when the only § 1983 cause of action is based on a violation of Title VII. The Court said:

"Like § 1985(3), § 1983 creates no substantive rights; it only provides a remedy. It would be anomalous to hold that when the only unlawful employment practice consists of the violation of a right created by Title VII, the plaintiff can bypass all the administrative processes of Title VII and go directly into court under § 1983. Thus, we believe the reasoning of *Novotny* applies."

Although the FMLA, unlike Title VII, does not set forth an administrative process which must be followed before an employee can bring an action for a violation of the Act, the right to bring and maintain a FMLA cause of action is clearly a limited right. Section 2617(a)(4) provides that "the right provided by paragraph (2) to bring an action by or on behalf of any employee shall terminate" on the filing of a complaint by the Secretary under subsections (d) or (b), unless the action is dismissed without prejudice on motion of the Secretary. Thus, an employee's cause of action brought under the FMLA is "trumped" by the Secretary's filing of a complaint.

Similar to the court's reasoning in *Day,* it would be anomalous to hold that when the only unlawful employment practice consists of a violation of the FMLA, the plaintiff can bypass the restrictions on the plaintiff's right to bring and maintain the action under the FMLA by framing the cause of action as one brought under § 1983.

Of even greater importance is the fact that 29 U.S.C. § 2617 sets forth in detail the specific remedies available for a violation of the FMLA. An employer is liable for damages in the amount of any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation. If no wages, salary, employment benefits, or other compensation have been lost, the employee can recover any monetary loss "such as the cost of providing care, up to a sum equal to 12 weeks of wages or salary for the employee." § 2617(a)(1)(A)(i). The employee also can recover interest on the above amounts calculated at the prevailing rate, § 2617(a)(1)(A)(ii), and an additional amount as liquidated damages equal to the sum of the amounts described in § 2617(a)(1)(A)(i) and (ii), but the court may, in its discretion, not allow liquidated damages if the court is satisfied that the violation "was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of § 2615 of this title." 29 U.S.C. § 2617(a)(1)(A)(iii). The employee also may obtain "such equitable relief as may be appropriate; including employment, reinstatement, and promotion," § 2617(a)(1)(B), and may recover "a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action." § 2617(A)(3).

This Court agrees with the conclusion reached in *Jolliffe* that the comprehensive detailed enforcement provisions of the FMLA show an intention of Congress that the specific remedies set forth in § 2617 be the exclusive remedies available for a violation of the FMLA.

The FMLA's enforcement scheme is modeled on the enforcement scheme of the Fair Labor Standards act (FLSA). Senate Report No. 103–3, 2 U.S.C.C.A.N., 103rd Con-

gress, First Session 1993 (hereafter, Senate Report). Courts have held that under that enforcement scheme, a plaintiff may not seek relief under § 1983 for violations of the FLSA. *Saunders v. Hunter,* 980 F.Supp. 1236 (M.D.Fla.1997); *Barfield v. Madison County,* 984 F.Supp. 491 (S.D.Miss.1997).

■ The Court is aware that 29 U.S.C. § 2651(a) provides that, "nothing in this Act (FMLA) or any amendment made by this Act shall be construed to modify or affect any Federal or State law prohibiting discrimination on the basis of race, religion, color, national origin, sex, age, or disability." It is clear from the Senate Report that the purpose of this provision was to ensure that the FMLA did not affect or amend Title VII or the Rehabilitation Act of 1973 or the Americans with Disabilities Act of 1990 or similar laws that provide "already existing rights and protection." Senate Report, p. 338. Section 1983 itself, of course, created no substantive rights, and while Congress did not intend to modify or affect other laws dealing with discriminatory practices, it does not follow that it intended that violations of the FMLA itself could be remedied in some manner other than by compliance with the enforcement provisions of § 2617.

This Court concludes that the enforcement scheme of the FMLA, like that of the FLSA, and Title VII provides the exclusive remedy for a violation of the Act, and that plaintiff's cause of action under 42 U.S.C. § 1983 must be dismissed.

## F. *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

■ The Ohio Supreme Court has adopted the standards set forth in the Restatement (Second) of Torts for considering claims for intentional infliction of emotional distress. *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 453 N.E.2d 666 (1983). To prevail on a claim for intentional infliction of emotional distress, a plaintiff must establish:

(1) That the actor either intended to cause or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;

(2) That the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community," Restatement (Second) of Torts (1965) 73, Section 46, comment d;

(3) That the actor's actions were the proximate cause of plaintiff's psychic injury; and

(4) That the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it," Restatement (Second) of Torts, § 46, comment j.

*Paige v. Youngstown Bd. of Educ.,* 1994 WL 718839, 1994 Ohio App. LEXIS 5942 (Ohio Ct.App. Dec. 23, 1994) (Citing *Pyle v. Pyle,* 11 Ohio App.3d 31, 463 N.E.2d 98 (1983)).

■ Applying this standard and construing the facts in a light most favorable to plaintiff, the Court is unable to find a genuine issue of material fact to support plaintiff's claim for intentional infliction of emotional distress. The plaintiff has shown no evidence that she suffered emotional injury so severe that "no reasonable man could be expected to endure it." Accordingly, defendants' motion for summary judgment with respect to the plaintiff's intentional infliction of emotional distress claim will be granted.

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS,** in part, and **DENIES,** in part, the defendants' motion for summary judgment. The motion is granted with respect to the plaintiff's Title VII and O.R.C. § 4112.02 claims, plaintiff's § 1983 claim, and plaintiff's state law claim of intentional infliction of emotional distress. The motion is denied with respect to plaintiff's claim of a violation of FMLA.

**IT IS SO ORDERED.**